Opinion filed August 31,
2012

 

                                                                       In The

                                                                              

  Eleventh
Court of Appeals

                                                                   __________

 

                                                         No. 11-11-00026-CV 

                                                    __________

 

                                        JOHN
REAVES, Appellant

 

                                                             V.

 

                                       KAREN
REAVES, Appellee



 

                                   On
Appeal from the 52nd District Court

 

                                                           Coryell
County, Texas

 

                                               Trial
Court Cause No. CD-07-37323

 



 

M E M O R A N D U M   O P I N I O N

            This
is a marital property distribution case.  At issue is the characterization of
an annuity. The trial court entered a memorandum of decision and confirmed that
the annuity was Karen Reaves’s separate property.  John filed a motion for
reconsideration; Karen filed a motion for the trial court to sign a final
divorce decree.  Both motions were heard on the same day.  The trial court entered
a second memorandum of decision in which it declined to re-characterize the
annuity and confirmed that the annuity was Karen’s separate property.  The court
then entered a final decree of divorce.  On appeal, John complains that the
trial court erred when it concluded that the annuity was Karen’s separate
property.  He also claims that the trial court erred when it valued a vehicle
that it awarded to Karen.  We affirm.

I. 
Background Facts

            John
and Karen Reaves were married for twenty years.  At the time of her marriage to
John, Karen owned a Best of America America’s Vision Annuity (the Vision
Annuity).  The annuity was funded by insurance proceeds that Karen received
after the death of her previous husband.  John was in active military service
when he married Karen, first in the Air Force and then in the Army.

            Karen
suffered a debilitating back injury in June 2000, and John became the primary
wage earner of the community.  John was on active duty in the military, and it
was his practice to leave Karen with a power of attorney when he was away on
duty.  In December 2002, John executed a power of attorney in which he appointed
Karen as his attorney-in-fact.  This power of attorney was set to expire on
December 2, 2005.

            As
part of the course of treatment for her back injury, Karen’s doctors prescribed
a pain management program for her.  The doctors prescribed Vicodin, Flexeril,
and trazodone for pain relief; Activelle for depression; and Zyrtec, Nasonex,
and Pantonol for allergy relief.  However, the course of treatment was not
effective.  Karen did not get better and experienced difficulty when she walked.


            Karen
later saw another doctor, who suggested that she would benefit from a facet
nerve ion injection.  The treatment alleviated Karen’s back pain.  However, she
went back to the doctor a week later with a new pain in her forearm and wrist.  On
July 3, 2003, the doctor increased Karen’s prescription for Celebrex and refilled
her prescription for Vicodin.

            Karen
and John met Dick Dwinell when they took a new member class taught by Dwinell
at their church.  In addition to his church activities, Dwinell was also a
financial planner.  On July 7, 2003, Karen and John met with Dwinell regarding
their financial investments.  Karen testified that she had not discussed
transferring her annuity, nor had she spoken to Dwinell about her finances at
all before she and John went to his office.  Karen was presented with documents
that were already filled out and ready for her signature.  Karen did not know
how Dwinell knew to have the transfer forms completed and ready for her
signature.  However, she did know that John had appointments with Dwinell outside
her presence.

            Dwinell’s
notes reflect that there were times when he spoke to John outside Karen’s
presence.  Dwinell noted that he asked John if they were sure about
transferring the couple’s IRAs and brokerage accounts from Fidelity to
Oppenheimer funds and that John replied, “Yes, we are”; Karen was not
present.   Dwinell had an asset allocation/risk tolerance worksheet on file that
was filled out by John on May 23, 2003.  However, there was not one for Karen
even though Dwinell admitted that “[t]here should have been one with Karen’s
signature on it as well.”   Karen introduced a document entitled “investment
advisory recommendations” that was prepared for Karen and John by Dwinell on
June 26, 2003.  The document included the recommendation that Karen’s Vision
Annuity be changed to the Future Annuity II.  In the corner of the document,
there is a handwritten notation of a call to Best of America for a change of
ownership and request for a letter of instruction.  Dwinell testified that that
call was made to Best of America regarding a change of ownership on July 1,
2003.

            One
of the documents presented to Karen for signature at the July 7 meeting was for
the conversion of her Vision Annuity to a new product, the Best of America
America’s Future Annuity II (the Future Annuity).  Karen testified that Dwinell
led her to believe that the change was a beneficiary change that would enable
John to receive the money from the annuity faster in the event of her death.  The
letter of acknowledgment that Karen signed lists the benefits of the
transaction as cost savings and the addition of a spousal rider.  Karen
testified that, when she raised concerns, Dwinell told her a story, which
Dwinell called his “commingling horror story,” to illustrate the consequences
of the transaction in the event of a divorce.  Dwinell told Karen that a judge
would have to determine the outcome.  But Karen testified that Dwinell
eventually told her that a judge would rule in her favor because the money
originated from the death of her first husband.

            Karen
testified that she did not understand the story that Dwinell used to explain
the consequences of a divorce.  However, she felt pressured, shamed, and “cajol[ed]”
by Dwinell for asking about divorce, so she finally signed the papers.  Karen
also testified that her intention on that day was to streamline John’s receipt
of benefits in the event of her death, not to make a gift to John’s separate
property

            Dwinell
did not explain to Karen that she was giving John half of the annuity.  Dwinell
recommended the transaction for its supposed tax advantages.  However, he never
advised Karen and John of the potential gift tax consequences of the
transaction.  Dwinell testified that he did not consider it a gift when spouses
transferred individual accounts into a joint account.  He knew that the annuity
was funded with a single premium purchased by Karen before the marriage and
that it was in her name, but he did not remember if he investigated whether it
was her separate property.  Dwinell agreed that he owed both John and Karen an
equal duty to look after their best interests.  However, a change in ownership
was of no benefit to Karen.  Every potential advantage Dwinell gave for
purchasing the new product could have been accomplished without making John an
owner on the account.  Dwinell made a $14,522.10 commission on the transaction.

            When
asked what he did to make sure Karen was completely informed about the
potential consequences of the transaction, Dwinell testified that he told Karen
that, if there was a divorce, a judge would have to make a determination.  The
potential for loss was “[i]mplied,” and he simply did not tell Karen that she
essentially was gifting half of the account because he thought that, “if you
have joint ownership, that should be understood.”  However, Dwinell also told
Karen that she was the “lead owner” and that John was the “joint owner,” but,
at trial, pleaded ignorance about the legal significance of those terms.  He
did not explain to Karen that she would no longer have authority to make
changes on the account without John’s permission because “[s]he didn’t ask the
question about it.”

            Dwinell
testified that he never would have recommended the change in ownership if he
thought he was dealing with clients who were going to get divorced.  However,
during the meeting, Karen specifically asked about the consequences of a
divorce.  Dwinell’s own notes from the meeting confirm this.  Dwinell’s
response was to tell Karen a story about a man who willed all his belongings to
his son but also remarried and changed his accounts to joint accounts with his
new wife.  The son was left out of the estate.  This story illustrates the
legal consequences of death, but not necessarily divorce.  Dwinell also
referred to the transaction as a “commingling” of the funds.  But no funds were
ever commingled.

            In
2005, Karen discovered that John was moving money away from their joint
accounts.  She responded by using her power of attorney to execute an Owner
Change Request form in which she asked to remove John as co-owner of the Future
Annuity II.  In January 2006, John retired from the U.S. Military, with twenty-two
years and two months of service.  Seventeen years and seven months of his
service occurred during his marriage to Karen.

            During
the summer of 2006, John began to live and work in San Antonio; he returned home
on the weekends.  In December of that year, Karen found, among John’s things, preliminary
paperwork regarding a divorce between them.  When Karen confronted him, John
admitted that he was planning to file for divorce when his work contract was
renewed.  Karen filed her own divorce action in February 2007.

            After
it heard testimony and weighed the evidence, the trial court issued a
memorandum of decision in which it characterized the Future Annuity II as
Karen’s separate property.  It also listed specific findings as the basis for its
decision.  The trial court found that Karen’s separate property solely funded the
Future Annuity II, that it was not increased by any community funds, and that
the current annuity was traceable to Karen’s separate property.  It also found
that, at the time of the conversion, the annuity was the largest asset owned by
either of the parties. 

            Additionally,
the trial court found that it was not Karen’s intent to make a gift of one-half
of the annuity to John and that she did not understand that her actions would
raise the presumption of a gift.  The trial court also found that the primary
discussion concerning the conversion was that it would reduce management fees
and would create a spousal benefit for John.  Karen’s intent was to purchase an
improved product.  It was also significant to the trial court that there apparently
was no discussion of estate planning, a common reason given for large gifts between spouses.  John’s and Karen’s
estates were not of a size to necessitate equalization of their estates
for estate tax purposes. 

            Finally,
the trial court found that John took an active role in arranging the
transaction. There was substantial direct contact, discussion, and
decision-making that took place between John and Dwinell regarding the annuity
conversion.  There was a personal relationship between the three parties
through their church.

            The
trial court found that the totality of the circumstances suggested that Karen
was not fully informed of the possible effects of the conversion of the annuity
and that she relied on John and Dwinell.  The circumstances, it found,
“indicate a situation in which it would not be appropriate to presume or imply
an actual intent to make a gift with regard to [Karen]’s primary separate
property asset which was the largest asset of her estate.”  At no time was
Karen made aware that she was making a gift of one-half of the annuity to John
as his separate property.  The trial court found that there was not sufficient
evidence to prove that the alleged gift was made knowingly, voluntarily, and
fairly.  The court made the specific finding that Karen’s testimony and the
other evidence were sufficient to rebut the presumption of a gift.

            The
court also valued each asset in the estate and made a division of those assets.
 The 2007 Honda Accord, the subject of appellant’s third and fourth issues, was
awarded to Karen and valued at $0.00. 

II.
 Issues

            In
his first two issues, John asserts that the trial court abused its discretion when
it characterized the annuity as Karen’s separate property because the evidence
was legally and factually insufficient to rebut the presumption that she had
gifted one-half of the annuity to him. In his third and fourth issues, he
argues that the evidence was legally and factually insufficient to support the
trial court’s valuation of Karen’s Honda Accord at $0.00.

III. 
Standard of Review

            Absent an abuse of
discretion, the trial court’s determination of the character of property and
its distribution will not be disturbed on appeal.  Murff v. Murff, 615
S.W.2d 696, 698–99 (Tex. 1981); Bigelow v. Stephens, 286 S.W.3d 619, 620
(Tex. App.—Beaumont 2009, no pet.); Wells v. Wells, 251 S.W.3d 834, 838
(Tex. App.—Eastland 2008, no pet.).  A trial court abuses its discretion when
it acts without reference to any guiding rules or principles.  Downer v.
Aquamarine Operators, Inc., 701 S.W.2d 238, 241–42 (Tex. 1985).  The mere
fact that a trial court may decide a matter within its discretionary authority
in a different manner than an appellate court in a similar circumstance does
not demonstrate that an abuse of discretion has occurred.  Sw. Bell Tel. Co.
v. Johnson, 389 S.W.2d 645, 648 (Tex. 1965).

            When an
appellant challenges the trial court’s order on legal or factual sufficiency
grounds, we do not treat these as independent grounds of reversible error but,
instead, consider them as factors relevant to our assessment of whether the
trial court abused its discretion. Wells, 251 S.W.3d at 838 (citing Boyd
v. Boyd, 131 S.W.3d 605, 611 (Tex. App.— Fort Worth 2004, no pet.).  To
determine whether the trial court abused its discretion because the evidence is
legally or factually insufficient, we consider whether the court (1) had sufficient evidence upon which to exercise its
discretion and (2) erred in the application of that discretion.  Id.
(citing Lindsey v. Lindsey, 965 S.W.2d 589, 592 (Tex. App.—El Paso 1998,
no pet.)).

            When the burden of proof at trial is clear and
convincing evidence, as when a party attempts to rebut the “community
presumption,” we apply a higher standard of legal and factual sufficiency
review.  See In re J.F.C., 96 S.W.3d 256, 265–66 (Tex. 2002); In re
C.H., 89 S.W.3d 17, 25–26 (Tex. 2002); Moroch v. Collins, 174 S.W.3d
849, 857 (Tex. App.—Dallas 2005, pet. denied).  Clear and convincing evidence
is defined as “that measure or degree of proof which will produce in the mind
of the trier of fact a firm belief or conviction as to the truth of the
allegations sought to be established.”  Moroch, 174 S.W.3d at 857; see
also Tex. Fam. Code Ann. §
101.007 (West 2008).  To meet the clear and convincing burden, the proof must “weigh
more heavily than merely the greater weight of the credible evidence, but the
evidence need not be unequivocal or undisputed.”  Moroch, 174 S.W.3d at
857–58.

IV.  Presumptions

            Property
possessed by either spouse during or on dissolution of the marriage is presumed
to be community property.  Tex. Fam.
Code Ann. § 3.003(a) (West 2006).  The party asserting that a certain
piece of property is actually separate property must establish the separate
character of the property by clear and convincing evidence.  Id. §
3.003(b).  “The statutory presumption that property possessed by either spouse
upon dissolution of the marriage is community is a rebuttable presumption and
is overcome by evidence that a specified item of property is the separate
property of one spouse or the other.”  Moroch, 174 S.W.3d at 856.  To
satisfy this burden, the spouse must trace “the separate origin of the property
through evidence showing the time and means by which the spouse originally
obtained possession of the property.”  Moroch, 174 S.W.3d at 856–57; see
also Cockerham v. Cockerham, 527 S.W.2d 162, 167 (Tex. 1975). 

            Property of a spouse owned before
marriage, and that acquired afterward by gift, devise or descent, is the separate
property of that spouse.  Tex.
Const. art. XVI, § 15; see also
Tex. Fam. Code Ann. § 3.001(2) (West
2006) (defining separate property as including property “acquired by the spouse
during marriage by gift”).  Property purchased during the marriage with monies
that can be traced to a spouse’s separate estate is characterized as separate
property.  Pace v. Pace, 160 S.W.3d 706, 711 (Tex. App.—Dallas 2005,
pet. denied).

            A
second presumption arises when, as here, a spouse uses separate funds to
purchase property during marriage and takes title to the property in joint
names.  In that event, there is a presumption that a gift was intended.  Harrison
v. Harrison, 321 S.W.3d 899, 902 (Tex. App.—Houston [14th Dist.] 2010, no
pet.) (citing Cockerham, 527 S.W.2d at 168).  This presumption, however,
can be rebutted by evidence that establishes there was no intent to make a
gift.  Id.  A rebuttable presumption shifts the burden to produce
evidence to the party against whom it operates.  Gen. Motors Corp. v. Saenz,
873 S.W.2d 353, 359 (Tex. 1993).  Once the burden is discharged and evidence
contradicting the presumption has been offered, the presumption disappears and
is not weighed or treated as evidence.  Id.

V.  Analysis

            A.  Karen’s Separate Property

            John
argues that the trial court abused its discretion when it characterized the
annuity as Karen’s separate property because the evidence was legally and
factually insufficient to rebut the presumption that she had gifted one-half of
the annuity to him.  Karen argues that the burden to prove donative intent
shifted back to John when she rebutted the presumption of an interspousal gift.
 Both parties agreed that the annuity could be traced to Karen’s separate
property prior to the marriage.  They also agreed that no community funds were
ever added to the annuity.  The issue, therefore, does not concern tracing but,
rather, whether Karen had the donative intent necessary to make a gift to John.
 

            Appellant
argues that, because the instrument of conveyance contained a “separate
property recital,” the trial court should not have allowed parol evidence to
rebut the presumption of gift.  He cites Roberts v. Roberts for this
proposition.  Roberts v. Roberts, 999 S.W.2d 424, 432 (Tex. App.—El
Paso 1999, no pet.).  John points to part of the letter of acknowledgment of
the Future Annuity II that Karen signed that contains a statement that she
“ordered the liquidation and transfer [of an] investment [she] currently own[s].” 
This, he says, is a “separate property recital” because it states that the
consideration for the Future Annuity II was Karen’s separate property.  He also
cites the prospectus for the Future Annuity II because it states that “[j]oint
owners each own an undivided interest in the contract.”

            In Roberts,
as in most, if not all, other cases that deal with “separate property
recitals,” land was the property at issue and the instrument of conveyance was
a deed.  In addition, the cases cited in Roberts dealt with transactions
whereby a wife received a deed that contained a recital that certain realty was
to be her separate property and that it was paid for from her separate
estate.  Henry S. Miller Co. v. Evans, 452 S.W.2d 426, 430–31 (Tex. 1970);
Messer v. Johnson, 422 S.W.2d 908, 912 (Tex. 1968).  Additionally, the
“separate property recitals” in these types of cases involve the use of specific
terminology.  “The cases which hold that parol evidence is not admissible to
contradict the express recitals in a deed, involve deeds which expressly state
that property is conveyed to grantees as their separate property or for
their separate use.”  Bahr v. Kohr, 980 S.W.2d 723, 727 (Tex. App.—San
Antonio 1998, no pet.).  The decision to exclude parol evidence rests “not upon
a recital of contractual consideration, but upon the fact that the instrument
stipulated, in effect, that the beneficial ownership of the property was
conveyed to the [spouse] for [his or her] separate use.” Jackson v. Hernandez, 285 S.W.2d 184,
186 (Tex. 1955).

            This case is distinguishable from Roberts
in that it does not involve a deed.  The recitals to which John refers in this
case do not state that John purchased his interest in the annuity with his own
separate property.  Also, the recitals are not that the property will be John’s
“separate” or “sole and separate” property or for his “separate use.”  The words
“separate property” or “separate use” are never used in the contract, letter of
acknowledgment, or prospectus.  Though the contract uses the term “joint owner,”
which is defined in the prospectus as giving joint owners “an undivided
interest in the contract,” nothing in the documents indicates that there has
been a conveyance from Karen to John or that any sort of transfer in beneficial
ownership has occurred. The trial court found that Karen relied upon Dwinell’s
advice in the transaction, but when asked about the meaning of “undivided
interest,” Dwinell testified, “You’re going way back in my memory banks” and “That’s
a legal term and I’m sorry.”  Because the contract does not expressly recite
the character and use of the property, we find that the parol evidence rule
does not prevent introduction of evidence to rebut the presumption of a gift. 

            Karen
testified that she did not intend to make a gift to John and that the only
purpose of the transaction was to streamline John’s receipt of benefits in the
event of her death.  Dwinell’s handwriting on the “Variable Annuity/Variable
Life Letter of Acknowledgement” seems to corroborate Karen’s testimony.  He
listed the savings in annual charges and the spousal rider feature as the
benefits of the transaction.  We conclude that Karen rebutted the presumption when
she testified that she did not intend to make a gift
and when she provided an alternative reason for the transaction.  See Harrison,
321 S.W.3d at 902.  Because Karen discharged her burden and offered evidence that
contradicted the presumption, the presumption disappears and is not weighed or
treated as evidence.  Id.  The evidence is then evaluated as in any
other case, and the presumption has no effect on the burden of persuasion.  Id.

            Thus,
the burden was placed back on John.  Generally speaking, one who is claiming
the existence of a gift has the burden of proof on that issue.  The burden to
prove a gift is on the party who claims it.  Powell v. Powell, 822
S.W.2d 181, 183 (Tex. App.—Houston [1st Dist.] 1991, writ denied).  A gift is a
“voluntary transfer of property to another made gratuitously and without
consideration.”  Wells, 251 S.W.3d at 839 (citing Hilley v. Hilley,
342 S.W.2d 565, 569 (Tex. 1961)).  To establish the existence of a gift, the
party must prove three elements: (1) intent to make a gift; (2) delivery of the
property; and (3) acceptance of the property.  Id.  (citing Long v.
Long, 234 S.W.3d 34, 40 (Tex. App.—El Paso 2007, pet. denied)).  A party
establishes the requisite donative intent by, among other things, presenting “evidence
that the donor intended an immediate and unconditional divestiture of
his or her ownership interests and an immediate and unconditional vesting of
such interests in the donee.”  Nipp v. Broumley, 285 S.W.3d 552, 559
(Tex. App.—Waco 2009, no pet.).

            Even
when applying a higher standard of legal and factual sufficiency review, there
is ample evidence in the record to support the trial court’s findings that
Karen did not intend to give one-half of the annuity to John as a gift.  Because
of her medical condition, Karen relied upon John to read the documents and tell
her of any major changes.  John, Karen, and Dwinell each testified that no one
ever told Karen that she was giving John anything.  The words “gift” or “give”
were never used, and the fact that the transaction would give half of the
account to John was not discussed by anyone.  The testimony at the hearing made
clear that Karen was ill-advised by Dwinell about the consequences of the
transaction.  We cannot say that the trial court abused its discretion.  There
was clear and convincing evidence of a lack of donative intent on Karen’s part.
 We overrule appellant’s first and second issues.  

            B. 
Valuation of the Honda Accord

            The
trial court awarded Karen a 2007 Honda Accord.  In his third and fourth issues,
John argues that the evidence is legally and factually insufficient to support
the trial court’s ruling by which it assessed the value of the Honda Accord.  The
trial court valued the car, less the debt secured against it, at $0.00.  John
filed a motion for reconsideration in which he asked the trial court to revalue
the car at $3,389.

            Karen
testified that the balance due on the car loan was $10,723.65.  She introduced
into evidence a statement from her credit union from June 27, 2008, several
days prior to the hearing, showing an auto loan balance in the amount of
$10,723.65.  John testified that the loan amount was $11,800 and that the
vehicle was worth $16,175.  This was all of the evidence before the court as to
the value of the vehicle and the debt secured by it.  

            However,
the court also had in its files inventories from both parties that were filed
after the trial hearing.  According to John’s First Amended Inventory and
Appraisement, the vehicle had a value of $11,925.  He attached to his inventory
an estimate from the Kelley Blue Book website that gave a range of trade-in
value estimates for the vehicle.  The values were listed as $11,925 for a
vehicle in excellent condition, $11,125 for a vehicle in good condition, and
$9,850 for a vehicle in fair condition.  The Kelley Blue Book valuations assume
“an accurate appraisal of condition.”  Karen stated in her first amended
inventory that the 2007 Honda Accord had no community value.

            Generally,
unless a party’s inventory is admitted into evidence, that party may not rely
on the inventory as evidence on appeal.  Tschirhart v. Tschirhart, 876
S.W.2d 507, 509 (Tex. App.—Austin 1994, no writ).  However, in Vannerson v.
Vannerson, the court concluded that, because sworn inventories are filed
with the trial court and because the court may take judicial notice of its own
papers, a trial judge may rely on information gleaned from sworn inventories even
if such documents have not been formally introduced into evidence.  Vannerson
v. Vannerson, 857 S.W.2d 659, 671 (Tex. App.—Houston [1st Dist.]
1993, writ denied).  In Bradford v. Bradford, the court held that the appellant
was estopped to complain that documents were not admitted in evidence and so
could not be considered on appeal when the trial court and parties treated the
documents as if they were in evidence and the appellant voiced no objection
below.  Bradford v. Bradford, No. 14-94-00881-CV, 1995 WL 613060, at *2
(Tex. App.—Houston [14th Dist.] Oct. 19, 1995, no writ) (not designated for
publication).

            In
this case, the inventories were not formally introduced into evidence.  They
were filed after the final hearing, but prior to the trial court’s memorandum
of decision.  John never objected to the trial court’s use of the inventories
as evidence below and does not make that argument on appeal.  The issue was not
mentioned in appellant’s motion for reconsideration or during the trial court’s
hearing on the motion, even though the trial court stated, “[T]he parties did
file amended inventories that were accepted by the Court in June of '09.  And I
understood that to be in addition to what evidence had been presented
previously.”  We do not think that, in this instance, the trial court erred by
relying upon information that it gleaned from the inventories.  However, even
if the trial court had erred, John has waived the issue.

            The trial court, as
the factfinder, is “entitled to consider the weight and credibility of the
testimony and other evidence submitted in making its determination as to the
valuations to be assigned to the various items of property.”  In re
Marriage of Jackson, 506 S.W.2d 261, 266 (Tex. Civ. App.—Amarillo 1974,
writ dism’d).  When a trial court is asked to
choose between different values, it has broad discretion in determining what
values to assign.  See Williams v. Clark, No. 03-03-00585-CV, 2004 WL
1171704, at *4 (Tex. App.—Austin May 27, 2004, no pet.) (mem. op.) (“faced with
two conflicting versions of the value of a piece of the couple’s property,” the
trial court did not abuse its discretion in choosing to believe one party over
the other).

            Karen and John gave roughly the same answer
when asked about the debt secured by the vehicle.  However, the trial court was
given a range of potential values that depended upon the condition of the
vehicle.  The court was given no evidence about the vehicle’s condition, other
than the fact that John assigned it a value that corresponds with the Kelley Blue
Book’s “excellent” category.  But, by all accounts, the value of the vehicle
was very close to the balance due on the loan.  The trial court had broad
discretion and was not without sufficient basis for its decision.  The trial
court did not abuse its discretion by assigning the vehicle a net value of
$0.00.  John’s third and fourth issues are overruled. 

            The
judgment of the trial court is affirmed.               

 

                                                                                                PER
CURIAM

 

August 31, 2012

Panel consists of: Wright, C.J.,

McCall, J., and Kalenak, J.